Carroll,
Feb. 2, 1943. } No. 3378.

ALBERT S. LAFONTAINE *v.* JOSEPH P. ST. JOHN.

*Burnham B. Davis, Robert W. Upton,* and *Laurence I. Duncan* (*Mr. Duncan* orally), for the plaintiff.

*Rolland R. Rasquin* (by brief and orally), for the defendant.

MARBLE, J.   The plan and mechanism of the defendant's mill are described at some length in the briefs.   For the purposes of the present discussion, however, these descriptions can be substantially condensed.

Two saws, a board saw and a sticking saw, were in operation on the day of the accident.   The sticking saw was situated in the pit of the mill below the level of the board saw.   The end of one of the sills which supported the frame of the board saw extended out over the pit toward the movable table of the sticking saw.   A cross beam, six inches wide, was set into this sill to the depth of two inches, leaving a four-inch projection of the cross beam above the sill and an eight-inch projection of the sill beyond the cross beam in the direction of the sticking saw.   The sill was seven inches in width. The plaintiff was standing on this seven-by-eight projection, his weight on his right foot, his left foot dangling in the air, when he fell to the table below.   The table moved forward to the sticking saw and the toes of his left foot were cut off.

A three-plank walk ran parallel with the sill and thirty inches distant therefrom.   On the other side of the cross beam, opposite the seven-by-eight projection, the surface of the sill was unobstructed for a space of twenty-six inches.

The carriage of the board saw was reversed by means of a jig-back belt, so called, which ran slack while the carriage was going forward. In order to keep the slack belt off the pulleys and thus prevent an accidental reversal of the carriage, a device known as a jill poke was in use.   This device consisted of a birch sapling nailed to an "upright slab" which "served as a fulcrum."   One end of the sapling was inserted under the upper level of the jig-back belt, the other end confined between two vertical sticks, or guides, which were attached to the cross beam above mentioned.

To insure sufficient play in the sapling, the nail by which it was attached to the fulcrum was not fully driven in and, because of the resulting looseness, the end of the sapling sometimes became released from its position under the belt.   This had happened immediately prior to the accident, and the board sawyer, who acted as foreman, had endeavored to make the proper readjustment. Being unable to do so, he returned to the saw with the intention of starting the carriage and thus taking up the slack of the belt so that the sapling could be more readily placed beneath it.   He then directed the plaintiff "to take the pole and put it under the belt" while he (the sawyer) "went ahead with the log."

The plaintiff's principal duty was that of rolling the logs from the skidway to the carriage of the board saw, but he testified that it was customary for workers in sawmills to help each other. He went forward in compliance with the sawyer's request and, without being specifically directed to do so, stepped across the thirty-inch space between the three-plank walk and the saw sill and stood on the projecting end of the sill as already described. He then "reached over" with his left hand and "took hold of the pole, the jill poke" and "pulled" on it; the jill poke gave way and he "went over backwards." The sapling was found in the bottom of the pit with the nail driven through it.

The plaintiff had worked in sawmills "off and on" for forty-five years. He had performed work of every kind about a mill except the work of sawing. The jill poke was not a novel contrivance and the plaintiff had "observed the workings of jill pokes" in two or three different mills.

The only suggestion that the sapling was not sufficiently fastened to the fulcrum came from the plaintiff himself, who stated that he "pulled and the pole let go." But there is no evidence that any appreciable amount of pulling was required in order to insert the sapling in its proper place. Some play was of course necessary or the pole would remain rigid and not vibrate with the running of the belt. On being asked the object of leaving a "space from the head of the spike to the top of the birch sapling," as was done in the present instance, one of the plaintiff's experts explained: "Well, this has to act as a hinge. If you nail it down tight you'll pin it and it won't function." It is thus obvious that the jill poke was not designed to withstand hard pulling, and the inference is strong that the plaintiff, despite his assertion to the contrary, first lost his balance and then pulled on the sapling in an effort to save himself.

The claim that the sticking saw was not properly guarded is without merit. The duty to exercise care is commensurate with the expectable risks of injury (*Miller* v. *Daniels*, 86 N. H. 193, 195; *Flynn* v. *Gordon*, 86 N. H. 198, 201; *Loughlin* v. *Johnson*, 89 N. H. 191, 193), and there is no evidence on which to predicate a finding that the defendant ought to have anticipated that any workman would occupy so precarious a position as that assumed by the plaintiff. In view of the plaintiff's long experience, the defendant could scarcely be required to instruct him as to the performance of his duties or the dangers of his employment. The mill itself was of standard construction.

In these circumstances it is difficult to discover any evidence of the defendant's negligence. It is unnecessary to decide that question, however, since in our opinion the conduct of the plaintiff, judged in the light of his knowledge and experience, definitely establishes his contributory fault.

The plaintiff deliberately chose to occupy a highly dangerous position which called for the exercise of acrobatic skill. The space in which he took his one-foot stand was so limited that, even though he placed his foot diagonally across it, the heel of his shoe protruded over the edge of the projecting sill. In this situation, with his left foot unsupported, he stooped down to pick up the handle of the jill poke. He stated that he could not have reached far "enough to grab" it from the twenty-six inch space, but that he might possibly have reached it standing with "one foot on each side of the cross beam." He was not asked why he did not place one foot on the sill and the other on the cross beam itself. Either of these latter positions would have been relatively safe and sufficiently close to the sapling, which, according to the plaintiff's own testimony, was still confined between the guides at a distance of only eighteen inches from the sill.

Some care on the plaintiff's part was demanded (*Cullen* v. *Littleton*, 84 N. H. 373, 376; *Morris* v. *Railroad*, 85 N. H. 265, 277; *Robinson* v. *Railroad*, 85 N. H. 474, 476), and his behavior in the face of apparent danger of which he must have been fully aware "can only be characterized as negligent." *Jackson* v. *Smart*, 89 N. H. 174, 177. This does not mean that he is barred from recovery because he assumed a known risk (a defence precluded by section 3 of the act), but rather because he "took no care to avoid a risk that was obvious." *Masters* v. *Company*, *ante*, 85.

*Judgment for the defendant.*

All concurred.